## Willenborg v. Capital City Products Co.

June 20, 1941.

Edrington & Redmon for appellant.

Woodward, Dawson & Hobson for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

The appellant, who was engaged in the wholesale cake business, filed this action against the appellee for damages resulting from the loss of cakes made by him alleged to have occurred by reason of defects in a substance called plastex purchased from appellee and used by appellant in making icings for the cakes. Appellee counterclaimed for $958.25, the purchase price of plastex sold and delivered by it to appellee. At the conclusion of appellant's evidence, the trial court directed a verdict for appellee as to the claim for damages and also directed a verdict for appellee on the counterclaim. From the judgment entered on the directed verdict, this appeal is prosecuted.

Prior to December, 1938, the appellant used cottonseed high ratio cake shortening in the manufacture of cakes and as fat for the icings and had no trouble of the kind here complained of. A salesman for appellee induced appellant to use appellee's brand of shortening, plastex, in place of the cottonseed product. After the purchase of the plastex in November, appellant did not use it, but in December the salesman came to appellant's shop and spent a day and part of another making up what is known as a fudge base for cake icings. The product, plastex, is made from palm products, sometimes from coconut butter and sometimes from palm kernel oil, the particular drum in controversy being made from the latter product. The plastex was used by appellant in his cake business for some months without mishap, but in June, 1939, the icings of a large number of cakes developed a sharp soapy taste and were unfit for consumption. These cakes were returned by appellant's customers. Appellant sent some samples of the

icings to the State Experimental Station at Lexington, and a laboratory test was made by Dr. A. L. Meador, a chemist. Dr. Meador was informed by appellant that in making the icing he used only plastex, powdered sugar, powdered milk and water. Proceeding on this assumption Dr. Meador made an examination and testified that in his opinion the soapy taste in the icing was caused by the plastex. He testified, however, that upon experimenting with five grams of oil extracted from the icing he was unable to demonstrate the presence of soap or alkali. He testified that he did not make a chemical analysis of the fat extracted from the icings as he did not have enough samples to do so. He said, however, that he did "ash" some of it and was unable to demonstrate the presence of alkali in it. According to him the fat extracted from the icing had a more pronounced soapy taste than the icing itself, and this led him to believe that the soapy taste was caused by the fat contained in the plastex. He was asked if he knew what the ingredients in the particular icing were, other than skimmed milk, water and sugar, and said that he did not make an investigation as to what the other ingredients were. It is apparent from the evidence that appellant had no real knowledge as to what actually produced the soapy taste in the cake icing and that he merely assumed that it was caused by the plastex.

Charles Mongere, president of appellee company, was called as a witness by appellant. According to him the plastex sold to appellant was made according to well known scientific principles and is a product in common use in cake making and is manufactured by a number of leading food concerns in the United States. He testified that the only complaint received by the company with reference to the product was from appellant. In this, however, he was contradicted by a witness, W. J. Quest, who testified that some cake icing made by him while using plastex developed a sharp soapy taste complained of by appellant. Mr. Mongere testified that bicarbonate of soda, flavorings and mold acting on the plastex would tend to cause a soapy taste—he did not testify that other chemicals or materials would not cause such a taste.

W. J. Quest testified that in one instance, while using plastex in the manufacturing of cakes, about the same time appellant had his trouble, his cake icings de-

veloped the soapy taste of which appellant complained. On cross-examination of this witness it appeared that he sent a sample of the icing base made from the plastex to Durkee's Famous Foods for analysis by their chemist. The report received from that chemist is in its material part as follows:

"The result of the laboratory test is somewhat peculiar. The odor and flavor were of a medicinal type, and whatever caused that we consider the seat of the trouble. The fat, when extracted from the fudge base, was perfectly neutral and of good flavor when tested, and showed the free fatty acid content at .15 per cent, which, although somewhat high, indicating that the fat was probably attacked by the ingredient causing the medicinal flavor, was not considerably off. The origination of the medicinal flavor and odor can not be located from our angle, but it is possible that in investigating the raw materials which you have used you may be able to check it."

The evidence in the case was quite lengthy, and we have merely attempted to give above the sum and substance of what appears to us to be the material portions of it. From a careful consideration of the entire testimony, the situation revealed to us appears to be that undoubtedly the plastex used by appellant was of perfectly neutral and bland flavor but that some chemical or product used by appellant in connection with it caused a chemical reaction resulting in the soapy taste. This is apparent from the report from the Durkee Company and from Dr. Meador's testimony. At first blush it would appear that the testimony of Dr. Meador, expressing the opinion that the "coconut butter," as he called it, was the cause of the trouble, was sufficient to warrant a submission of the case to the jury, but a careful examination of his entire testimony convinces us that this is not true for the reason that he did not have before him all the necessary facts on which to base his opinion. His opinion was based upon the assumption that only powdered sugar, powdered milk and water were used in combination with the plastex when, in fact, other ingredients were used. It is our conclusion that the appellant's evidence was sufficient merely to create a suspicion that the plastex was the cause of the trouble but that a suspicion and nothing more is all that was

established. The burden was on appellant to establish that appellee's product used by him was defective. This, we think, he could establish only by one possessing the necessary qualifications who had made a complete examination and was in possession of all the facts. It is argued for appellant, however, that in making the icing bases he used only the formulas prepared for him by appellee's agent when he came to appellant's plant and showed him how to use the plastex in making the icing bases. But the evidence does not bear this out. Appellant did not so testify, but, on the contrary, stated that he used formulas worked up by specialty men of different baker's supply houses. Had it been established that he used the formulas furnished by appellee's agent and had it been shown that the materials used in such formulas were free of defects, and that nothing out of the ordinary, which might cause the chemical reaction which happened, was used in the cake, itself, it might be that a case for the jury would have been made out but such is not the case before us.

From the evidence as a whole it appears to be established that an excess of bicarbonate of soda in the cake itself, exclusive of the icing, could have procured a chemical reaction on the plastex, resulting in the sharp soapy taste. That substance was admittedly used by appellant in baking the cakes. No chemist, and it seems that a chemist would probably be the only person qualified to speak on this technical subject, was ever placed in full possession of all the facts nor did he have access to all the materials that went into the making of the icings and cakes. In the absence of testimony of this character, we cannot escape the conclusion that the trial court was correct in directing a verdict for appellee on this issue.

It is contended by appellant that the trial court erred in directing a verdict for appellee on the counterclaim because the cause of action stated in the counterclaim was not the proper subject of counterclaim under Section 96 of the Civil Code of Practice, which provides that a counterclaim is a cause of action arising out of the contract, or transactions, stated in the petition as the foundation of the plaintiff's claim, or which is connected with the subject of the action. There may be some plausibility in the appellant's theory that the cause of action stated in the counterclaim, that is, the

action for the purchase price of plastex sold and delivered, does not *arise* out of the transaction stated in the petition, but it appears to us that such cause of action is, at least, connected with the subject of the action within the meaning of the code provision. The contract stated in the petition is composed of the shipment of the specific drum of plastex in controversy. The purchase price of the product sold to appellant is undoubtedly connected with the transaction on which appellant based his cause of action. The sale and purchase of the product was a continuing transaction between appellant and appellee. Had appellee sued appellant on the account for the product sold to him, appellant could undoubtedly have counterclaimed for damage resulting to him from defects in the product—that is, he could, by counterclaim, have asserted the very claim that he sued on here. This being true, it follows as a matter of course that in the action filed by appellant for damages, appellee could counterclaim for the purchase price of the product sold during the continuing transaction.

Judgment affirmed.